UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x

GAETANO D'ATTORE,

            Plaintiff,

        -against-

NEW YORK CITY DEPARTMENT OF
CORRECTION; CAPTAIN SALMON,
Shield # 10315; and DR. DORA
SCHRIRO, Commissioner, New York
City Department of Corrections,

            Defendants.
----------------------------------x

REPORT & RECOMMENDATION
and
MEMORANDUM & ORDER

10 Civ. 815 (JSR)(MHD)

TO THE HONORABLE JED S. RAKOFF, U.S.D.J.:

     Plaintiff Gaetano D'Attore, an inmate in the New York City correctional system during the relevant period, commenced this pro se section 1983 lawsuit against a corrections officer, Capt. Salmon, the Commissioner of Corrections, Dr. Dora Schriro, and the City of New York Department of Correction, alleging that Capt. Salmon assaulted him verbally, physically, and without provocation, causing lasting injuries, as well as hurt feelings. At the conclusion of discovery, plaintiff and defendants each moved for summary judgment.

     We now address both parties' motions. Concluding that there are triable issues of fact regarding the encounter between

plaintiff and Capt. Salmon, we recommend that defendants' motion be denied as to Capt. Salmon, but granted with respect to all other defendants. As for plaintiff's motion, it should be dismissed.

### Plaintiff's Evidence

Plaintiff has asserted what amounts to an excessive-force claim against Capt. Salmon. In his complaint and deposition testimony, plaintiff described that his encounter with Capt. Salmon started while he was waiting for a corrections officer named Smith to accompany him to pick up plaintiff's pain medications from the prison clinic. At the time, plaintiff was apparently disabled from a prior accident and was using a walking cane. Plaintiff also reports that he was assigned at the time to a specific Rikers Island facility that was capable of accommodating his physical disability. (Defs.' Rule 56.1 Statement Ex. C ("Dep. Tr.") 39)

As plaintiff recounted, Capt. Salmon entered the area in high dudgeon, screaming about the need to close all cells, to call the law library, and to close the barbershop. At some point, plaintiff approached her and asked if he could proceed to retrieve his pain medications, and she assertedly responded that he would have to wait until she was ready to let him do so. He walked away, but

2

approached her again some minutes later to ask once more if he could go for his medications, a question that apparently triggered a tirade by Capt. Salmon. According to Mr. D'Attore, "She said you will get your fucking medication when I say you can get it and not before," a remark that he characterized as "screaming and yelling at me, like I'm her kid or somebody that she totally disrespects." (Dep. Tr. 37-38).

In plaintiff's account, he stepped away because Capt. Salmon was "showing physical threats. She got hot, yelling, screaming, coming towards me and I backed up into a guardrail." (Id. at 38). At that point, according to D'Attore, while she was screaming that this was her "house," he asked her not to curse at him, to which she responded "Who the fuck do you think you are? Because you're white?" He responded by asking her to stop screaming at him, and apparently alluded to a pending lawsuit he had against her from "a prior incident." In plaintiff's narrative, Capt. Salmon "became enraged" and punched him twice in the left shoulder, causing plaintiff "excruciating pain" as plaintiff's "whole shoulder took the impact" of her second blow. (Id. at 38). Plaintiff then started to turn away from Capt. Salmon, while she continued to scream at him. As he did so, Capt. Salmon asked if he was going to hit her with his cane, to which he responded that he would never do so.

3

Capt. Salmon then reportedly threw another punch, while simultaneously pushing plaintiff, causing him to go stumbling through a door, before crashing his right shoulder into an officers' post. Plaintiff reports that the immediate impact caused "excruciating pain" in his lower back, leg and neck. He promptly reported to the nearest officer that he had just been assaulted, and asked for assistance. (Id. at 38-39). At that point Capt. Salmon ran into the room, screaming and saying "I will get you out of here." D'Attore responded that he was medically mandated to be in that particular facility since he "can't be walking" and "can't climb stairs properly." (Id. at 39).

In plaintiff's version of events, Capt. Salmon then handcuffed him and ordered him taken to "intake," an area with small cells and with an alleged reputation as a locale where disfavored prisoners are subjected to officers' physical abuse. (Id. at 40). When he arrived at "intake," plaintiff asked the officer on duty, named Sarno, for access to a deputy warden because he had just been assaulted. (Id.). He described himself as frightened because of the potential that he would be assaulted again, and hence he repeated his request for a deputy warden to a Capt. Hardy, who agreed to notify one. (Id. at 41).

4

As plaintiff was waiting in "intake," Capt. Salmon entered the room and began complaining to plaintiff that he had undermined her authority. He denied having done so, and insisted that he did not "deserve what you did to me," noting that he was recovering from injuries from a prior "work accident." When asked by Capt. Salmon whether he wanted to return to the "house," plaintiff agreed. (Id. at 41). He testified that he was, nonetheless, still frightened and that Salmon had remarked, in a threatening manner, "You are still under my authority." (Id. at 54). When Capt. Pitman, a friend of Capt. Salmon, soon thereafter presented plaintiff with an incident report and insisted that plaintiff write a summary of his complaint, plaintiff provided only a partial account of the event, omitting details of the actual violence, allegedly due to his ongoing fear of perceived threats from the prison officials. On a form labeled "INMATE VOLUNTARY STATEMENT," which sets forth a pre-printed disclaimer that the statement was made "VOLUNTARILY of my own free will without promise of reward or under threat of physical harm or fear of such," plaintiff wrote the following:

> I GAETANO D'ATTORE, herein state the following to be true in fact and to the best of my knowledge. At approx. 9:30 I was trying to obtain my pains meds, a[] disagreement occurred between me and Captain Salmon. I was sent to intake. I and Captain Salmon spoke, we explained to one another our misunderstanding and have reconciled our differences.

(Defs.' Rule 56.1 Statement Ex. D). In explaining his omission of
any reference to the physical aspect of the encounter, D'Attore
testified that he had written this sanitized account while "under
duress and distress and anxiety. I was scared for my life. I just
wanted to get out of there." (Dep. Tr. at 42).

According to plaintiff, he was then sent to the law library,
where he was told to go the medical clinic. He testified that when
he saw the doctor, plaintiff explained what had occurred, (id. at
42-43), an account corroborated by the "INJURY TO INMATE REPORT" of
that date, in which the doctor recited that plaintiff had "ALLEGED
THAT HE WAS ASSAULTED BY D.O.C. STAFF AT 0930 HRS WHILE IN HOUSING
AREA 1 NORTH." (Defs.' Rule 56.1 Statement Ex. E). The report
states that plaintiff complained of left-shoulder and lower-back
pain, although the doctor noted "No apparent injuries," but,
according to plaintiff, gave him a prescription for Tylenol 3.
(Id.; Dep. Tr. at 43). Plaintiff reports that he still suffers from
swelling and pain to his shoulder, and he referred to having
provided to defendants an MRI report that alluded to two tears in
the left shoulder as well as one definitive, and possibly two,
tears in the right shoulder. (Dep. Tr. at 46; see also Pl.'s Reply
Affirmation [docket no. 56] 9-10 (Report of Dr. Ciavarra, June 8,
2010)). He also testified that the incident aggravated a pre-

6

existing spinal condition, which had necessitated the surgical fusing of the C-3 through C-5 and L-5 through S-1 vertebrae, as a result of a prior accident. (Dep. Tr. at 79-80). Plaintiff also claimed emotional distress from the incident, including sleeplessness and heightened anxiety. (Id. at 88-89).

### Defendants' Motion

Defendants have applied for summary judgment. At the outset they assert that plaintiff has failed to allege and cannot prove that the City of New York had any responsibility for the plaintiff's clash with Capt. Salmon. Second, defendants advance the equivalent argument that Commissioner Schriro had no involvement in the alleged assault by Capt. Salmon. Accordingly, they say, the claims against the City and the Commissioner must be dismissed.

With respect to the claim of excessive force against Capt. Salmon, defendants pursue three arguments. In doing so, they do not proffer any account of the event from Capt. Salmon or any other witness to the encounter, other than key portions of plaintiff's own testimony.

First, defendants suggest that plaintiff's version of the

7

event is incredible as a matter of law, and that the court may therefore reject, without trial, his testimony as to the circumstances of the alleged assault. They premise this position on (1) alleged inconsistencies between his complaint and his deposition testimony, (2) the fact that he wrote an account of the event that mentions a "disagreement" with Capt. Salmon but does not describe any physical force allegedly used by the defendant, (3) his history of mental illness, (4) the absence of any treatment note in the Injury Report, and (5) a corrections captain's opinion -- apparently based primarily on plaintiff's so-called Voluntary Statement -- that D'Attore had invented the story of a physical assault for reasons of "personal gain." (See Defs.' Rule 56.1 Statement Ex. E; Defs.' Mem. of Law 8-14).

Second, defendants argue that whatever physical force may have been exerted against plaintiff was "de minimis." According to defendants, the push and shove resulted in no injury and necessitated no treatment, and even if it did cause injury, the punches and shove were still so minor in a prison setting as to be non-litigable. (Defs.' Mem. of Law 14-16).

Third, on the premise that plaintiff suffered no physical injury, defendants point to 42 U.S.C. § 1997e(e), which precludes

suits by inmates for emotional distress resulting from conditions of confinement if the plaintiff did not suffer any physical injury. According to defendants, a showing that the inmate suffered de minimis physical injuries does not meet the statutory requirement and, as a result, defendants contend that plaintiff has failed to satisfy his burden of proof with respect to his claim of emotional distress.

Plaintiff has opposed defendants' motion, but his pro se papers in large measure do not address the specifics of defendants' arguments. Instead, plaintiff alludes in general terms to the supposed failings of defendants' counsel and the inadequacies of their conduct of discovery. (See Pl.'s Opp'n, marked "Answer," 2-6). Defendants' reply does little other than complain that plaintiff's response to their Rule 56.1 Statement is not compliant with the pertinent local rule. (See Defs.' Reply Mem. 2-4).[1]

As for plaintiffs' motion, his papers reiterate his basic narrative, attaching portions of his deposition transcript. He

---

[1] Apart from these arguments, defendants refer to plaintiff's summary-judgment motion, which they read as seeking in effect to assert an unpled claim against trial counsel for defendants, and they urge that the court sua sponte decline to recognize such a claim. (Defs.' Mem. of Law 17). We address that issue in discussing plaintiff's own motion for Rule 56 relief.

9

seems to seek summary judgment on his assault claim against Capt. Salmon and spills much ink attacking defendants' trial counsel, whom he seems to want to add as a defendant in this case. (See Pl.'s Opp'n 2-6). Defendants' response argues, of course, for denial of all aspects of this motion and also requests that the court dismiss plaintiff's entire complaint based on plaintiff's "inappropriate behavior" throughout the litigation. (Defs.' Opp'n Mem. of Law 3).

ANALYSIS

We address defendants' motion first. Before doing so, we briefly summarize the standards applicable to Rule 56 motions.

A. Summary Judgment Standards

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of

the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Shade v. Hous. Auth. of New Haven, 251 F.3d 307, 314 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986); see, e.g., Anderson, 477 U.S. at 255; Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for her motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see, e.g., Celotex, 477 U.S. at 323; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy her initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g.,

11

Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the movant fails to meet her initial burden, however, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970); Giannullo v. City of New York, 322 F.3d 139, 140-41 (2d Cir. 2003). If the moving party carries her initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact on any such challenged element of its claim. See, e.g., Beard v. Banks, 548 U.S. 521, 529 (2006); Celotex, 477 U.S. at 323-24; Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001). In doing so, the opposing party cannot rest "merely on allegations or denials" of the factual assertions of the movant, Fed. R. Civ. P. 56(e); see, e.g., Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti, 374 F.3d 56, 59-60 (2d Cir. 2004), nor can she rely on her pleadings or on merely conclusory factual allegations. See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). She must also "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005).

12

Rather, she must present specific evidence in support of her contention that there is a genuine dispute as to the material facts. See, e.g., Celotex, 477 U.S. at 324; Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir. 1994).

If both sides move for summary judgment, the court must separately assess the adequacy of each motion. Thus, if neither movant satisfies her Rule 56 burden, the court must deny both motions. E.g., Marvel Entm't, Inc. v. Kellytoy (USA), Inc., 769 F. Supp. 2d 520, 524 (S.D.N.Y. 2011) (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)).

B. Defendants' Motion

1. The City of New York as Defendant

Defendants initially challenge the viability of any claim by plaintiff against the City of New York.[2] In his papers, plaintiff

---

[2] We note that, in his complaint, plaintiff identifies the City Department of Correction, but not the City of New York, as a defendant. However, § 396 of the New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency." New York City

does not attempt to plead facts that would state a viable claim, or indeed any claim, against the City. In fact, the evidentiary basis for plaintiff's claim is fundamentally inconsistent with any existing legal theory of municipal liability. Such liability under section 1983 may be imposed only on the basis of a showing that the City bore some direct responsibility for the alleged violation of plaintiff's constitutional rights. See, e.g., City of Canton v. Harris, 489 U.S. 378, 385 (1989) ("[A] municipality can be found liable under section 1983 only where the municipality itself causes the constitutional violation at issue.") (emphasis in original).

   To establish municipal liability, plaintiff must demonstrate that his constitutional rights have been infringed by a municipal agent "whose acts may be fairly said to be those of the municipality" and that his injury was caused by a "municipal 'policy' or 'custom.'" Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397,

---

Charter § 396 ch. 16. This provision has been interpreted to require that where a plaintiff means to sue for the wrongdoings of a City agency, such as the City Department of Correction, the proper defendant is the City of New York. See, e.g., Woodward v. Morgenthau, 740 F. Supp. 2d 433, 440 (S.D.N.Y. 2010); Bailey v. N.Y.C. Police Dept., 910 F. Supp. 116, 117 (E.D.N.Y. 1996). Because pro se pleadings "must be construed liberally and interpreted 'to raise the strongest arguments they suggest,'" Triestman, 470 F.3d 471, 474 (2d Cir. 2006) (quoting and adding emphasis to Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006)), we construe plaintiff's claims against the Department of Correction as "suggesting" a claim against the City of New York.

14

403-04 (1997) (quoting, inter alia, Monell v. Dep't of Soc. Servs.,
436 U.S. 658, 694 (1978)). A single unconstitutional act or
decision, when taken by an authorized decision-maker, may be
considered policy and thus subject a municipality to liability.
Brown, 520 U.S. at 405-06. Alternatively, a policy may be
established by showing that the acts of the municipal agent were
part of a widespread practice that, although not expressly
authorized, constitutes a custom or usage of which the supervising
policy-maker must have been aware. See, e.g., Connick v. Thompson,
131 S. Ct. 1350, 1359 (2011); City of St. Louis v. Praprotnik, 485
U.S. 112, 127 (1988); Monell, 436 U.S. at 690-91.


     The Supreme Court has further held that, in appropriate
circumstances, a municipality's failure to provide adequate
training or supervision of its agents, if it amounts to deliberate
indifference, may constitute such a policy or custom and thereby
trigger liability under section 1983. See, e.g., Brown, 520 U.S. at
407-08 (citing City of Canton, 489 U.S. at 387-91); see also
Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 873 (2d Cir. 1992).
But "[a] municipality's culpability for a deprivation of rights is
at its most tenuous where a claim turns on a failure to train."
Connick, 131 S. Ct. at 1359 (citing Oklahoma City v. Tuttle, 471
U.S. 808, 822-23 (1985)). In order to incur liability, the inaction

15

by the municipality "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Id. (quoting City of Canton, 489 U.S. at 388) (brackets in original). This "deliberate indifference" standard is satisfied only in narrowly circumscribed circumstances, that is, when the City's policy-makers are on notice of the strong likelihood that failure to act -- most commonly, failure to adequately train municipal officials -- will lead to constitutional violations. See, e.g., Connick, 131 S. Ct. at 1359-60 (quoting, inter alia, Brown, 520 U.S. at 407, 410). This generally requires proof of "[a] pattern of similar constitutional violations by untrained employees." Id. at 1360 (citing Brown, 520 U.S. at 409). Similarly, a failure to supervise will trigger Monell liability only if the municipality was aware of a pattern of violations by hitherto-unsupervised employees, or had another compelling reason to know that a failure to provide closer supervision was likely to lead to violations by those employees. E.g., Reynolds v. Giuliani, 506 F.3d 183, 192-93 (2d Cir. 2007) (discussing Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992)).

Plaintiff's account of what occurred reflects at most the rage of a single middle-level prison official on a singular occasion. There is no basis to infer that her alleged conduct was carried out

pursuant to City policy or at the direction of a decision-maker, nor is there any basis to infer that her alleged conduct was part of a pattern of conduct by Department personnel that might suggest that the City approved of or acquiesced to such behavior. Finally, there is no evidence that inadequate training or supervision caused Capt. Salmon's alleged outburst, of which plaintiff complains.

In sum, plaintiff has failed to assert a <u>Monell</u> claim in this case, and, even if he had done so, that claim would have to be dismissed for failure to satisfy the legal standard.

### 2. Commissioner Schriro as a Defendant

Plaintiff has also named as a defendant the Commissioner of Corrections, Dora Schiriro. He does not, however, plead any involvement by her in the incident at issue here, nor does he proffer any evidence suggesting that the Commissioner was responsible for Capt. Salmon's alleged conduct. This is fatal to his claim against her.

A plaintiff may not prevail on a constitutional tort claim against an individual defendant absent proof that the defendant was personally responsible in some way for the alleged misconduct. It

is well settled that, regardless of a defendant's position in the
governmental hierarchy, she cannot be held liable under section
1983 for an award of damages absent some form of personal
involvement in the constitutional tort. See, e.g., Scott v.
Fischer, 616 F.3d 100, 110 (2d Cir. 2010)(quoting McKinnon v.
Patterson, 568 F.2d 930, 934 (2d Cir. 1977)); Provost v. City of
Newburgh, 262 F.3d 146, 154 (2d Cir. 2001); Wright v. Smith, 21
F.3d 496, 501 (2d Cir. 1994).

Until recently the accepted standard for personal involvement
by a supervisor was that articulated in Colon v. Coughlin, 58 F.3d
865, 873 (2d Cir. 1995). In Colon, the Court identified five
categories of conduct that may demonstrate the personal involvement
of a supervisory defendant. Such personal involvement, the Court
held, may be shown by evidence that:

> (1) the defendant participated directly in the alleged
> constitutional violation, (2) the defendant, after being
> informed of the violation through a report or appeal,
> failed to remedy the wrong, (3) the defendant created a
> policy or custom under which unconstitutional practices
> occurred, or allowed the continuance of such a policy or
> custom, (4) the defendant was grossly negligent in
> supervising subordinates who committed the wrongful acts,
> or (5) the defendant exhibited deliberate indifference to
> the rights of [plaintiff]s by failing to act on
> information indicating that unconstitutional acts were
> occurring.

18

Id.; accord Provost, 262 F.3d at 154; Wright, 21 F.3d at 501; see also Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) (quoting Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

Recently, however, the scope of what qualifies as "personal involvement" by a supervisor has come into question by virtue of a 2009 decision in which the Supreme Court held, in a pleading context, that "[b]ecause vicarious liability is inapplicable to... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948 (2009). The Second Circuit has not yet addressed how Iqbal affects the five categories of conduct that give rise to supervisory liability under Colon. However, because Iqbal specifically rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," several decisions in this district have held that Iqbal has nullified most of the longstanding Colon factors. See Bellamy v. Mount Vernon Hosp., 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third Colon categories pass Iqbal's muster - a supervisor is only held liable if that supervisor participates

directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."); Newton v. City of New York, 640 F. Supp. 2d 426, 448 (S.D.N.Y. 2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in Ashcroft v. Iqbal."). These courts have concluded that "[o]nly the first and part of the third Colon categories pass Iqbal's muster," and that "[t]he other Colon categories impose the exact types of supervisory liability that Iqbal eliminated," because only the first and third categories sufficiently allege personal involvement to permit supervisory liability to be imposed after Iqbal. Bellamy, 2009 WL 1835939, at *6; Spear v. Hugles, 2009 WL 2176725, at *2 (S.D.N.Y. July 20, 2009) ("The Supreme Court explicitly rejected the argument that, 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.'... Accordingly, only the first and third Colon factors have survived the Supreme Court's decision in Iqbal.").

We disagree with this narrow interpretation of Iqbal, as have a number of other courts. See, e.g., Delgado v. Bezio, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011); Qasem v. Toro, 737 F. Supp. 2d 147, 152 (S.D.N.Y. Aug. 10, 2010); D'Olimpio v. Crisafi, 718 F.

Supp. 2d 340, 347 (S.D.N.Y. 2010), aff'd, 462 F. App'x 79 (2d Cir. 2012). We believe, as observed in Sash v. United States, 674 F. Supp. 2d 531 (S.D.N.Y. 2009), that "[i]t was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." Id. at 544 (internal citation omitted). Thus, as in the present case, where the claim does not require a showing of discriminatory intent, the personal-involvement analysis set forth in Colon should still apply. Id. (citation omitted); D'Olimpio, 718 F. Supp. 2d at 347. Hence we look to earlier Second Circuit precedent that applies the tests of deliberate indifference or gross negligence to assess supervisory liability. That analysis demands a showing of actual or constructive notice to the supervisory defendant of constitutional torts committed by their subordinates. Sash, 674 F. Supp. 2d at 544; cf. Connick, 131 S. Ct. at 1360.[3]

---

[3]Although Connick dealt solely with municipal liability under section 1983, we believe that its analysis is informative as to the scope of personal liability for supervisors and supports our conclusion that Colon remains largely intact. In the context of either municipal liability or supervisory liability, the Supreme Court has clearly stated that a defendant is only responsible for his own actions. Compare Connick, 131 S. Ct. at 1359 ("[U]nder § 1983, local governments are responsible only for 'their own illegal acts'... [t]hey are not vicariously liable under § 1983 for their employees' actions.") (quoting Pembaur v.

That said, the complaint is devoid of any suggestion that the Commissioner was aware of, or promoted, physical aggression by prison staff, or that she had somehow acquiesced to such conduct by Capt. Salmon or others. Absent any evidence to that effect, the claim against Dora Schriro must be dismissed, and summary judgement granted in her favor.

---

City of Cincinnati, 475 U.S. 469, 479 (1986)) (emphasis in original), with Iqbal, 129 S. Ct. at 1948 ("Because vicarious liability is inapplicable to... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Hence, if failure-to-train claims or the "deliberate indifference" test for a supervisor's personal involvement in constitutional violations under § 1983 were both no longer viable after Iqbal, we would expect that the same type of section 1983 claims would fail if asserted against a municipality. Yet in Connick, which post-dates Iqbal, the Supreme Court applied the "deliberate indifference" test to a failure-to-train claim. 131 S. Ct. at 1360-66. In addressing Connick's failure-to-train claim against the supervisory defendant, the Supreme Court ultimately rejected municipal liability on the ground that the plaintiff had not proven a "pattern of similar violations" sufficient to establish that the supervisory defendant had received adequate notice of the specific constitutional violation. The Court thus found that Connick failed to show a "'policy of inaction' that [was] the functional equivalent of a decision by the city itself to violate the Constitution." Id. at 1366 (quoting City of Canton, 489 U.S. at 395). Notably, however, the Court did not suggest that municipal liability was completely unavailable in the context of a failure-to-train claim. Compare Newton, 640 F. Supp. 2d at 448. Nor did the Court suggest that municipal liability was unavailable with respect to a claim of deliberate indifference. Compare Bellamy, 2009 WL 1835939, at *6. We therefore infer that the Court preserved Colon's fifth factor of analysis for claims of personal involvement in section 1983 cases.

3. The Claim Against Capt. Salmon

Plaintiff asserts a claim against Capt. Salmon based on the contention that, without provocation and for no penological purpose, she attacked him verbally and then physically, causing him "intense pain." There seems to be no disagreement that the alleged tongue-lashing does not amount to a violation of D'Attore's constitutional rights, see, e.g., Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1986); Govan v. Campbell, 289 F. Supp. 2d 289, 300 (N.D.N.Y. 2003), but the parties dispute the viability of plaintiff's claim with respect to the alleged acts of physical assault.

We address defendants' arguments in support of summary judgment in the order in which defendants assert them.

(a) The Credibility of Plaintiff's Account of an Assault

In pursuing their motion, defendants assert that plaintiff could not persuade a reasonable fact finder that he was subjected to a physical assault by Capt. Salmon. In doing so, defendants do not proffer any account by an eyewitness to dispute plaintiff's version of the encounter with Capt. Salmon. Indeed, the only

23

testimony directly pertinent to this question is plaintiff's deposition testimony, which he briefly reiterates in some of his motion papers, and the only other evidence directly addressing the matter is a report by a corrections captain who alludes to an investigation of unspecified nature and scope, which led her to believe that plaintiff had invented the assault portion of his account. (Defs.' Rule 56.1 Statement Ex. D).

Thus, on its face, the record presents a dispute as to a material fact -- that is, whether Capt. Salmon physically attacked plaintiff. Such a factual dispute is triable, and is not appropriate for resolution at the summary-judgment stage because its resolution turns on the respective credibility of D'Attore and any competent witnesses whom defendants might call to testify. It is the role of the jury at trial, not that of the court considering summary judgment, to make such credibility assessments. See, e.g., Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010); Scholastic, Inc. v. Harris, 259 F.3d 73, 87 (2d Cir. 2001).

In seeking to avoid this conclusion, defendants urge that the court "should pierce the veil of plaintiff's factual allegations and find as a matter of law that no reasonable jury could find in

24

plaintiff's favor." (Defs.' Mem. of Law in Support of Summ. J.
13)(citing <u>Shabazz v. Pico</u>, 994 F. Supp. 460, 470-71 (S.D.N.Y.
2000)). As the premise for this argument, they assert that "the
Second Circuit has previously held that in circumstances where the
plaintiff relies almost exclusively on his own testimony, a court
may make assessments about whether a reasonable jury could credit
a plaintiff's testimony." (<u>Id.</u> at 8-9 (citing <u>Jeffreys v. City of
New York</u>, 426 F.3d 549, 555 (2d Cir. 2005)). The controlling
language quoted by defendants, is that "when the facts alleged are
so contradictory that doubt is cast upon their plausibility, [the
court may] pierce the veil of the complaint's factual allegations
and dismiss the claim." (<u>Id.</u> at 9 (quoting <u>Shabazz</u>, 994 F. Supp. at
470)). Applying this reasoning to the current case, defendants
assert that "plaintiff's own sworn statements, his complaint,
deposition testimony, and medical records are so inconsistent that
defendants respectfully submit that no reasonable jury could find
in plaintiff's favor." (<u>Id.</u> at 9).

We disagree. Although plaintiff's assertion that Capt. Salmon
punched and shoved him may remain open to question on the current
record, that does not warrant deciding a factual issue of
credibility in the context of a summary-judgment motion. Instead,
the function of assessing credibility is reserved for the trier of

25

fact. E.g., Fincher, 604 F.3d at 725.

In seeking a court ruling that would, in substance, reject the otherwise competent and admissible testimony of D'Attore as to Capt. Salmon's alleged assault, defendants rely principally on the Second Circuit's decision in Jeffreys v. City of New York, 426 F.3d at 554-55, in which the Court affirmed the grant of summary judgment against a plaintiff who had alleged that, while unlawfully present in a school building, he had been set upon by a group of police officers, who severely beat him -- including with a flashlight used to strike him repeatedly on the head -- and then threw him out of a third-floor window. Id. at 551. According to Jeffreys, he was rendered unconscious but woke up lying on the ground outside the building, and he inferred that he had been thrown out of the window by the police. Id. In affirming summary judgment, the Court acknowledged that there were conflicts between the plaintiff's testimony about these allegations and the accounts of the officers, but it then focused on the question of whether the disputes were "genuine," that is, "whether 'the jury could reasonably find for the plaintiff.'" Id. at 553 (quoting Anderson, 477 U.S. at 252).

The Court recounted the differing testimonial versions of

26

Jeffreys and the officers, one of whom reported that he had discovered Jeffreys hiding under a desk in the school, and that Jeffreys had fled by running to a window and jumping out, at which point the officer had called to his companions outside that he believed (albeit mistakenly) that Jeffreys was fleeing by way of a fire escape. The other officers reported that they had not entered the classroom in question while Jeffreys was there. The Court further recited, as a plainly crucial point, that it was undisputed that on three separate occasions within hours or days after the incident, Jeffreys had admitted (to medical personnel, to a sergeant, and to prison screening personnel) that he had in fact jumped or run out of a window, and on one occasion he further admitted that he had injured himself and made no mention of being attacked by the police. Id. at 552. The panel also noted that, insofar as Jeffreys alleged that he had been beaten in the classroom, he was unable to identify or even describe any of the officers involved. Finally, the Court observed that Jeffreys was subsequently prosecuted and pled to numerous burglaries, and that throughout the criminal proceedings he had never mentioned either being beaten by any police officers or being thrown out of the classroom window, and the contemporaneous medical records were inconsistent with his claim of being beaten about the head by the police. Id. at 552-53.

27

Given this prior history of admissions by Jeffreys, the Court upheld the grant of summary judgment based on the District Court's determination that "'Jeffreys'[s] own testimony [was] so replete with inconsistencies and improbabilities that a reasonable jury could not find that excessive force was used against him.'" Id. at 553 (quoting Jeffreys v. City of New York, 275 F. Supp. 2d 463, 475 (S.D.N.Y. 2003)). Indeed, the panel upheld the grant of Rule 56 relief specifically because the lower court had "found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony." Id. at 555. See also id. ("'when the facts alleged are so contradictory that doubt is cast upon their plausibility, [the court may] pierce the veil of the complaint's factual allegations... and dismiss the claim.'")(quoting Shabazz, 994 F. Supp. at 470). Only in such circumstances did the Court agree that the defendants had "me[]t the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." Id. at 554 (citing Fischl v. Armitage, 128 F.3d 50, 56 (2d Cir. 1997)). Indeed, the Second Circuit has since recognized precisely this distinction in declining to apply Jeffreys when the plaintiff's own testimony is not self-contradictory or wholly implausible on its face. See Fincher, 604 F.3d at 725-26; see also Butler v. Gonzalez, 2010 WL 3398150, *5-6

28

(S.D.N.Y. Aug. 26, 2010).

This focus in <u>Jeffreys</u> on whether the plaintiff's own testimony -- if otherwise unsupported -- betrays facial inconsistencies or implausibilities finds analytical support in a line of Second Circuit decisions that have held that a plaintiff may not use an affidavit to create issues of fact, and thereby avoid summary judgment, if his affidavit testimony would contradict admissions that he had previously made at his deposition. <u>See</u>, e.g., <u>Estate of Hamilton v. City of New York</u>, 627 F.3d 50, 54 (2d Cir. 2010); <u>Mack v. United States</u>, 814 F.2d 120, 124 (2d Cir. 1987). The point is that a plaintiff may not manipulatively alter the record in a such a manner that his Rule 56 testimony is, on its face or in the context of all of his statements, either contradictory or so implausible as to preclude credence by a reasonable trier of fact. That is precisely why Jeffreys's case was dismissed.

We view the <u>Jeffreys</u> decision cited by defendants in support of their motion to be readily distinguishable from the facts of this case. Defendants here do not establish that D'Attore's testimony is, either on its face or in light of any other statements he has made, so self-contradictory or implausible as to

29

rule out granting them any weight whatsoever. There is no indication in the record that D'Attore has ever directly contradicted his current version of his account. Although the "Voluntary Statement" does not mention the alleged physical contact, it simply avoids specifying the details of the encounter. (Defs.' Rule 56.1 Statement Ex. D). Moreover, D'Attore has testified that he felt threatened and intimidated by Capts. Pitman and Salmon into writing the version of events contained in that document, an explanation that is supported, at least inferentially, by the cryptic nature of the narrative in the Statement and by the fact, as recounted by plaintiff, that his assailant was present when Capt. Pitman demanded that plaintiff provide that statement. In fact, the very creation of the Statement, with its preprinted representation that it was "voluntary," could be taken to suggest the opposite, that is, that after Capt. Salmon engaged in an unprovoked physical assault, she and her colleague were anxious to try to cover it up by pressuring plaintiff into providing a sanitized account of the encounter. Moreover, plaintiff's account that he filled out the form in the way that he did because he was frightened and felt pressured may also be supported by the fact that, shortly afterwards, when he was in the comparative safety of the medical clinic, he reported to the treating doctor that he had, in fact, been assaulted by prison staff, plainly referring to his

30

encounter with Capt. Salmon. (Defs.' Rule 56.1 Statement Ex. E).
Finally, we note that plaintiff recounted asking several officers
in the wake of the incident to call a deputy warden to report the
assault, and it appears that these requests triggered the
appearance of Capt. Pitman with a "Voluntary Statement" form for
plaintiff to fill out.

As for inherent implausibility, the notion that a prison
employee who may be short-tempered momentarily took out her anger
on a prisoner who was badgering her to get permission to move out
of his area for a personal errand is not in itself so implausible
as to require summary judgment. See Fincher, 604 F.3d at 725-26.
The vast array of prison litigation with which we are familiar
suggests that occasional bursts of physical abuse by prison
officers may occur from time to time, whether out of frustration or
for other reasons. See, e.g., Davis v. New York State Dept. of
Corr., 2012 WL 3070083 (S.D.N.Y. July 27, 2012); Steadman v. Mayo,
2012 WL 1948804 (S.D.N.Y. Mar. 27, 2012); Ninortey v. Shova, 2008
WL 4067107 (S.D.N.Y. Sept. 2, 2008); Mitchell v. Keane, 974 F.
Supp. 332, 337 (S.D.N.Y. 1997), aff'd, 175 F.3d 1008 (2d Cir. 1999).

Further undermining defendants' argument is their failure to
elicit any testimony, or indeed any written account, by any of the

31

alleged eyewitnesses to the encounter, most notably Capt. Salmon
and Corrections Officer Smith, or witnesses to the period
immediately following the alleged assault, in which plaintiff
alleges that he complained to several corrections officers that he
had been assaulted. Instead, defendants proffer a document created
by Capt. Salmon's colleague, Capt. Pitman, who was not present for
the event and who observes that she made some sort of inquiry about
the encounter and came to the conclusion -- for reasons unspecified
-- that D'Attore had not suffered a physical assault but had made
up his story for "personal gain." (Defs.' Rule 56.1 Statement Ex.
D). Pitman's report might not even be admissible as evidence, since
it offers no detail as to the nature and extent of the
investigation[4] other than, implicitly, Pitman's insistence that
D'Attore fill out the Voluntary Statement. Even if the report is
admissible, it certainly does not add meaningfully to defendants'
argument for bypassing the jury's role in assessing credibility.

---

[4] Rule 803(8)(A)(iii) authorizes the admission of a "record
or statement of a public office" provided that it contains
"factual findings from a legally authorized investigation..."
But a predicate for admission is presumably a foundation that the
document was created pursuant to such an investigation. See Beech
Aircraft Corp. v. Rainey, 488 U.S. 153, 154 (1988) ("Appropriate
limitations and safeguards lie in the fact that the Rule's
requirement that reports contain factual findings bars the
admission of statements not based on factual investigation...").

Defendants also seek to justify the invocation of <u>Jeffreys</u> by referring to supposed inconsistencies between plaintiff's complaint and his deposition testimony regarding the extent of his injuries. (Defs.' Mem. of Law 9). Putting to one side the marginal relevance of the extent of plaintiff's injury to the question of whether a plaintiff's allegation of an assault is triable, we note that the purported inconsistencies are minimal or non-existent, and the asserted discrepancies seem principally attributable to the fact that the complaint is not intended to encompass all of the evidentiary facts that may be explored in deposition. Defendants, for example, note that the complaint does not mention that plaintiff had a pre-existing back condition and yet he referred to it in his testimony (Defs.' Mem. of Law 10), an argument to which the short and colloquial answer is "So what?" Defendants also refer to testimony by plaintiff that describes a wide variety of injuries caused or exacerbated by the alleged assault, suggesting that he may have exaggerated the extent of his resultant injuries. However, such exaggeration does not itself preclude a finding of liability, nor does it, by itself, justify entry of summary judgment in defendants' favor.

Defendants next accuse plaintiff of falsely testifying that when he went to the medical clinic in the wake of the alleged

33

attack, the doctor gave him Tylenol 3, whereas the Injury to Inmate Report "states that the doctor examining plaintiff noted no injuries, did not prescribe any treatment and did not refer plaintiff for any other treatment." (Defs.' Mem. of Law 10). The document in question (Defs.' Rule 56.1 Statement Ex. E), after referring to plaintiff's description of the assault, does state "No apparent injuries" and lists under "Treatment" the word "none." It is not self-evident whether the noted lack of "apparent injuries" refers to anything other than "visible injuries," thus indicating that no further examination, such as x-rays or other scans, was conducted.[5] In any case, plaintiff testified to intense pain at the time of the attack, and did not suggest that he suffered injuries that would have been visible on surface examination. As for lack of a reference in the report to Tylenol, that seems a matter for a credibility challenge at trial and not a basis for precluding a jury's decision on the ultimate question of liability.

Defendants next allude to the undisputed fact that plaintiff's medical history reflects numerous pre-existing injuries, including chronic serious neck and back pain. (Defs.' Mem. of Law 11-12). Defendants do not explain the significance they attribute to this

---

[5] The document contains a box for the doctor to check whether injuries were "visible" and the doctor checked the "none" box.

fact, but, if anything, we believe it actually lends potential support to plaintiff's testimony that being punched and shoved by Capt. Salmon caused him intense pain. Indeed, if, as plaintiff described, he was violently and unexpectedly pushed, this might well have caused at least temporary derangement to an apparently already deformed and injured spine, a circumstance that we note would likely not be visible to a doctor upon later examination for surface injuries. In any event, to the extent that this discussion goes to the question of the extent, if any, of plaintiff's consequential injuries, it does not speak to whether judgement should be entered now on the basis that no assault took place.

Finally, defendants invoke what they describe as plaintiff's history of mental illness and asserted medical malingering over the years to reinforce their contention that summary judgment should be entered on the basis of a purportedly necessary disbelief of plaintiff's account that an assault took place. (Defs.' Mem. of Law 12-13). If defendants' theory is that plaintiff imagined the incident as a result of a pre-exiting psychiatric condition, they may proffer expert-witness testimony to that effect, but in the current motion they fail to do so, and hence the court declines to accept their invitation to speculate about the matter. As for asserted past medical malingering, again that may conceivably go to

35

credibility and the extent of damages, but it does not provide a basis for shortcutting a trial regarding liability.

In sum, we are not persuaded that the record justifies a finding, as a matter of law, that no physical assault took place. See, e.g., Bennett v. (Individual) Officers, 2011 WL 1900185, *5-8 (S.D.N.Y. April 8, 2011); Butler, 2010 WL 3398150, at *5-6.

### (c) Was the Physical Force De Minimis?

Defendants' next challenge to the claim against Capt. Salmon is premised on the contention that the amount of force that Capt. Salmon used was de minimis and, thus, cannot trigger liability. They point to the absence of any indication that Tylenol was given to plaintiff, and the absence of any apparent outward physical markings reflecting trauma.

In assessing a force claim, context is, of course, crucial. It is thus essential for the court to avoid conflating Eighth Amendment excessive-force analyses appropriate to the prison context with Fourth Amendment excessive-force claims applicable in non-prison contexts. See Bonilla v. Jaronczyk, 354 F. App'x 579, 581 (2d Cir. 2009) (quoting Graham v. Connor, 490 U.S. 386, 395

(1989)). Generally, the standard for assessing uses of force is somewhat more lenient when the force is applied to a prisoner rather than a free member of the public. Compare, e.g., Hudson v. McMillian, 503 U.S. 1, 7-10 (1992) (court looks to whether force was used by prison guard "maliciously and sadistically," that is, "wantonly," and whether it was more than de minimis), with Graham, 490 U.S. at 398-99 (test is whether the amount of force used in arrest of a non-inmate was reasonably necessary to safely accomplish the arrest). In part, this distinction is attributable to the fact that, in a prison setting, the need for some degree of force is more commonly encountered than would likely be true outside the prison setting. See, e.g., Hudson, 503 U.S. at 9 ("not every malevolent touch by a prison guard gives rise to a federal cause of action.") (citing Johnson v. Glick, 481 F.2d 1028 (2d Cir. 1973)). Hence the courts are generally careful to treat force claims in a prison context somewhat differently from those that arise when the police deal with free members of the public. See, e.g., United States v. Walsh, 194 F.3d 37, 47-50 (2d Cir. 1999) (addressing Hudson, 503 U.S. 1, and specifying that its test applies to force claims "in a prison context").

As for the amount of force that would trigger liability, the courts do seem to recognize a requirement that the force used in

37

either context should usually be more than de minimis. Nonetheless,
even in prison cases, the Supreme Court has cautioned that the de
minimis use of force will trigger an Eighth Amendment violation if
its application is "repugnant to the conscience of mankind,"
Hudson, 503 U.S. at 10, a term that the Second Circuit has held to
cover any "malicious use of force." Walsh, 194 F.3d at 50 (quoting
Blyden v. Mancusi, 186 F.3d 252, 263 (2d Cir. 1989)). Accord, e.g.,
Wilkens v. Gaddy, 130 S. Ct. 1175 1178-79 (2010); Wright v. Goord,
554 F.3d 255, 268-69 (2d Cir. 2009).


     In our case, plaintiff's contention is that Capt. Salmon used
force against him for no penological reason whatsoever -- that is,
that the assault was entirely unprovoked -- and that it caused him,
among other things, excruciating pain at the time. The contention
that defendant acted with no purpose other than to cause harm would
seem to distinguish plaintiff's case from those in which prison
officers used force for colorably legitimate purposes, but
allegedly used more force than was required under the
circumstances. Indeed, one of the cases cited by defendants for
their de minimis argument, Gashi v. Cnty. of Westchester, 2007 WL
749684 (S.D.N.Y. March 12, 2007), aptly illustrates the difference.
In that case, the plaintiff claimed that on three occasions the
defendant officers had used unnecessary force against him, but the

record reflected that plaintiff had engaged in threatening or assaultive behavior towards the officers, and that the officers had used necessary force to subdue him, allegedly causing minor injuries. Id. at *1-3. Indeed, in one instance, the event was caught on videotape, which apparently corroborated the officers' version of events. Id. at *3. On summary judgement, the court determined that the amount of force used was not unreasonable, given the circumstances, and therefore did not violate Eighth Amendment standards. Id. at *6-8.

Because our case involves an alleged use of force solely to harm an apparently vulnerable inmate, summary judgment would not be appropriate based solely on the arguable absence of long-lasting injury to plaintiff. The Second Circuit's decision in Walsh is instructive in this regard. The defendant, formerly an Orleans County corrections officer, was convicted on three counts of violating 18 U.S.C. § 242, which prohibits the violation of another person's constitutional rights while acting under color of law -- in that case, the Eighth Amendment rights of an inmate. The trial evidence established that, apparently for no purpose other than inflicting  pain, the defendant had deliberately stepped on the penis of a troublesome but mentally defective inmate while he was in his cell, assertedly as a predicate to giving the inmate a

39

cigarette, and in the process caused the prisoner "unnecessary and wanton pain." Id. at 41. On appeal, Walsh argued, inter alia, that the evidence did not establish a violation of the inmate's Eighth Amendment rights because the trial record reflected that he had caused no injury other than transient pain. Indeed, one witness testified that the incident had lasted perhaps one second and that the inmate had screamed in pain at that moment and for an apparently brief period afterwards but soon seemed "fine" and did not require medical attention, id. at 42, and the prison doctor reported that although the inmate had often asked for attention for minor problems, he had never sought medical attention in the wake of this incident. Id. at 43.

The Second Circuit affirmed the defendant's conviction in Walsh, and in doing so addressed Walsh's argument that "his acts do not rise to the level of a constitutional violation because they involved nothing more than the de minimis use of force, insufficient under Hudson, 503 U.S. at 9-10, 112 S. Ct. 995." Id. at 49. In rejecting this contention, the appellate court observed that, apart from satisfying the subjective element of an Eighth Amendment violation, since "there was absolutely no reasonably perceived need for the application of force," id. at 50, the evidence satisfied the requirement that "the deprivation" be

"objectively sufficiently serious or harmful enough." Id. at 50
(citing Hudson, 503 U.S. at 8). In ruling on the seriousness of the
violation, the Court held that this requirement was satisfied in
two way. First, as the panel noted, under Hudson the objective test
may be met even if the injury is not "serious or significant," "as
long as the amount of force used is not de minimis." Id. (quoting
Hudson, 503 U.S. at 9-10). Thus, although the Court observed that
"some degree of injury is ordinarily required to state a claim
after Hudson," id. (citing cases), it held that "the pain suffered
by [the inmate] as a result of Walsh's assaults satisfies this
requirement." Id. (citing Norman v. Taylor, 25 F.3d 1259, 1264 n.4
(4th Cir. 1994)). In short, even transient pain, at least if
intense, will suffice to satisfy the objective standard.

Second, the Court went on to hold in the alternative that,
even if the force used were deemed de minimis, the evidence would
satisfy the Eighth Amendment standard based on the Hudson Court's
recognition that "de minimis uses of force are unconstitutional if
they are 'repugnant to the conscience of mankind.'" Id. (quoting
Hudson, 503 U.S. at 10). In that context, the Court reiterated a
prior holding that "'the malicious use of force to cause harm []
constitute[s] [an] Eighth Amendment violation[] per se.'" Id.
(quoting Blyden, 186 F.3d at 263). In the words of the Second

41

Circuit, "[t]his is so because '[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated.'" Id. (quoting Blyden, 186 F.3d at 263). Accord Wilkins v. Gaddy, 130 S. Ct. 1175, 1178-99 (2010); Wright, 554 F.3d at 268-69.

In our case, plaintiff testified that he felt excruciating pain when he landed against the officers' post, after having been punched and shoved by Capt. Salmon for no apparent reason other than to vent her anger by inflicting pain on an inmate. Accepting, as we must on a summary-judgement motion, the pertinent testimony of plaintiff about the encounter and about the pain that defendant Salmon allegedly caused him at the time[6] -- and irrespective of later medical assessments of his condition -- we must necessarily conclude that a trier of fact could find that D'Attore suffered the requisite injury -- that is, that the force was not de minimis -- and, alternatively, that in pummeling a physically disabled prisoner for no legitimate purpose, Capt. Salmon acted, however

---

[6] Pain is, of course, subjective, and there is no evidence that would even contradict, much less disprove as a matter of law, plaintiff's rendering of his physical reaction to the alleged assault. Cf. Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991)("Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true.").

42

briefly, "maliciously and sadistically... to cause harm."

In sum, we reject defendants' argument that the record demonstrates that no plausible Eighth Amendment violation may be found.

### (d). The Injury Requirement of 42 U.S.C. § 1997e(e)

Defendants' last line of attack is based on a provision of the Prison Litigation Reform Act that states: "No Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). As defendants themselves note, the courts have equated the statutory term "physical injury" with the standards elaborated under the Eighth Amendment. (Defs.' Mem. of Law 16 (citing cases)). For reasons that we have discussed, plaintiff's testimony about severe pain suffered at the time of the alleged punching and shoving is sufficient to defeat summary judgment on the question of whether the assault involved de minimis force under the Eighth Amendment, and it necessarily follows that defendants' proffered statutory defense concerning plaintiff's claims for emotional injury must also fail on the current motion.

43

C. <u>Plaintiff's Motion</u>

D'Attore also seeks summary judgment. In his initial set of pro se submissions, plaintiff repeats in very summary fashion his contention that he was assaulted by Capt. Salmon and that he suffered serious and continuing injuries as a result. He also asserts, again in conclusory form, that the City should also be held liable and that defendants' counsel, Assistant Corporation Counsel Lisa Richardson, Esq., should be deemed a defendant as well. Defendants respond principally, and perhaps understandably, by focusing on Ms. Richardson's status as a non-party and on the inappropriateness of adding her as a defendant, if that is what plaintiff is seeking to do. Defendants also note that plaintiff proffers no evidence on his summary-judgment motion, and they add a further riposte that the case should be dismissed as a sanction for plaintiff's "inappropriate behavior," including "refusing to provide medical releases, refusing to answer relevant questions at his deposition, subjecting [counsel] to a barrage of yelling during plaintiff's deposition, demeaning and questioning the undersigned's ability to practice law and wasting judicial resources by filing numerous frivolous motions with this Court." (Defs.' Opp'n Mem. of Law 5). This submission triggered a massive response by plaintiff

in reply, a set of documents that seem in major part irrelevant --
including papers from two other cases that he has pending in this
court, numerous copies of miscellaneous documents that he has
copied from this litigation, as well as a draft order to show
cause, seeking in part to add defendants' counsel as a defendant.
(See generally Pl.'s Reply Aff.; Pl.'s Dec. 13, 2011 letter to Ct.
(docket no. 57)).

Plaintiff's motion should be denied. He fails to proffer any
competent evidence in his initial papers and thus fails to carry
his initial Rule 56 burden. In any event, for reasons discussed at
length here and amply demonstrated in defendant's own motion for
summary judgment, the question of whether plaintiff was subjected
to an assault and, if so, the surrounding circumstances appears to
be hotly contested and, thus, not susceptible to determination on
summary-judgment motions. Insofar as plaintiff appears to be
seeking to add trial counsel as a defendant, that request must be
denied, since there is no proffered factual or legal basis for
doing so, and in any event the motion comes long after the close of
discovery and in the midst of summary-judgment-motion practice.

Finally, insofar as defendants now suggest that the case
should be dismissed because of plaintiff's obstreperous and

occasionally boorish behavior, we decline to take that step. To the extent that plaintiff failed in his discovery obligations, we have addressed on a timely basis all applications by defendants for relief. None of them warranted dismissal, and we see no reason to take that step now. As for plaintiff's alleged misconduct off the record, defendants do not make a competent showing of what occurred and when, nor did they seek corrective action on a timely basis, and in any event, while plaintiff may be an extremely unpleasant litigant, we have been presented with no convincing basis to dismiss, at this stage, an otherwise triable case.

CONCLUSION

For the reasons stated, we recommend that defendants' motion for summary judgment be granted in part, dismissing Commissioner Dora Schriro and the City as defendants in the case, and that the motion be denied with respect to Capt. Salmon. We recommend denial of plaintiff's motion for summary judgment and we deny his apparent application to amend his complaint to add defendants' trial counsel as a defendant. Finally, we recommend denial of defendants' request, in opposition to plaintiff's motion, that the court dismiss the complaint for "inappropriate behavior."

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Jed S. Rakoff, Room 1340, 500 Pearl Street, New York, New York, 10007-1312, and to the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007-1312. Failure to file timely objections may constitute a waiver of those objections, both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636 (b)(1); Fed. R. Civ. Pro. 72, 6(a), 6(e); Thomas v. Arn, 474 U.S. 140 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d. Cir. 2000) (citing Small v. Sec'y. of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).


Dated: New York, New York
       September 27, 2012




MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE


47

Copies of this Report & Recommendation are being sent today to:

Mr. Gaetano D'Attore
10-A-5728
Upstate Correctional Facility
P.O. Box 2001
Malone, New York 12953

Lisa M. Richardson, Esq.
Assistant Corporation Counsel
 for the City of New York
100 Church Street
Room 3-170
New York, New York 10007